UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROBERT I. SARGENT, IV**, <br><br> Plaintiff <br><br> v. <br><br> **CAROLYN W. COLVIN** <br> *Acting Commissioner of Social Security*, <br><br> Defendant | CIVIL ACTION NO. 3:14-CV-00254 <br><br> (MEHALCHICK, M.J.) |

**MEMORANDUM OPINION**

This is an action brought under Section 1631(c)(3) of the Social Security Act, 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the Plaintiff's claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 17, Doc. 18). For the reasons expressed herein, it is recommended that the decision of the Commissioner be **AFFIRMED**.

I.  **BACKGROUND AND PROCEDURAL HISTORY**

On June 15, 2011, Plaintiff protectively filed an application for SSI alleging disability due to "Sed, neck injury, back injury, depression, anti-social, anxiety disorder, ibs, and hbs,"

beginning June 14, 1989.[1] (Admin Tr. 659, Doc, 10-4 p. 8). Plaintiff's claim was denied initially on September 14, 2011. Plaintiff requested, and was granted, the opportunity to present his case at an administrative hearing. On June 8, 2012, Plaintiff, represented by counsel, appeared and testified at a hearing before Administrative Law Judge ("ALJ") Susan L. Torres in Wilkes-Barre, Pennsylvania. Impartial Vocational Expert ("VE") Carmine Abraham also appeared and testified at the hearing. Following the hearing, the ALJ denied Plaintiff's application in a written decision dated June 28, 2012. Thereafter, Plaintiff sought review by the Appeals Council. His request, however, was denied on December 16, 2013, making the ALJ's June 28, 2012 decision the final decision of the Commissioner subject to judicial review. 20 C.F.R. §416.1481.

On February 12, 2014, Plaintiff filed a complaint requesting that this Court enter an order reversing the ALJ's June 2012 decision and awarding benefits, or, in the alternative, that this case be remanded for a new administrative hearing. (Doc. 1). On May 2, 2014, the

---

[1] Plaintiff has alleged that he became disabled due to his impairments more than twenty years prior to his application for benefits. The Court notes that Plaintiff has applied for benefits several times since the late 1990s. (Admin Tr. 121-23, Doc. 10 pp. 123-26). In the application for benefits which immediately preceded the application subject of this action, Plaintiff alleged disability due to "back pain, sinus problems, cervical disc and arthritis" beginning April 16, 2009. (Admin Tr. 127, Doc. 10 p. 130). After his application was denied initially, Plaintiff requested an administrative hearing. On November 15, 2010, such a hearing was held before ALJ Michele Wolff in Wilkes-Barre, Pennsylvania. The ALJ denied Plaintiff's April 2009 application in a written decision dated January 26, 2011. (Admin Tr. 600-12, Doc. 10-3 pp. 103-15). There is no evidence in the record that Plaintiff sought review by the Appeals Council, thus the ALJ's January 2011 decision is binding on the parties with respect to that application. 20 C.F.R. §416.1455.

Commissioner filed her Answer. (Doc. 9). Together with her Answer, the Commissioner filed a copy of the administrative transcript. (Doc. 10). This matter has been fully briefed by the parties and is now ripe for decision. (Docs. 11, 12)

II. **DISCUSSION**

    A. STANDARD OF REVIEW

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g)(sentence five); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before the Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon

a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §416.905(a).

In determining whether a claimant is disabled under the Social Security Act, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. §416.920(a). Under this process, the Commissioner must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §416.920. The claimant bears the initial burden of demonstrating a

medically determinable impairment that prevents him or her from doing past relevant work. 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §416.912; *Mason*, 994 F.2d at 1064. Once the claimant has established at step four that he or she cannot do past relevant work, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with his or her age, education, work experience and RFC. 20 C.F.R. §416.912(f); *Mason*, 994 F.2d at 1064.

Before completing step four of this process, the ALJ must also determine the claimant's RFC. 20 C.F.R. §416.920(e). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §416.945(a)(1); SSR 96-8p, 1996 WL 374184. In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §416.945(a)(2).

  B. THE ALJ'S DECISION

In her June 28, 2012 decision, the ALJ proceeded through each step of the sequential evaluation process. She found that Plaintiff, born on September 15, 1968, was a "younger person" as defined by the Social Security Regulations when his application was filed, but during the pendency of this action, Plaintiff progressed into the "closely approaching advanced age" category. (Admin Tr. 28, Doc. 10 p. 31). Further, the ALJ found that Plaintiff had a limited education based on Plaintiff's testimony that he was enrolled in a special program for socially and emotionally disturbed ("SED") children when he was in second grade, dropped out of

school after finishing ninth grade and earned his G.E.D. in the early nineties. (Admin Tr. 28, Doc. 10 p. 31; Admin Tr. 1203, Doc. 10-7 p. 87).

At step one of her analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity between June 15, 2011 and the date of her decision. (Admin Tr. 28, Doc. 10 p. 23). In fact, Plaintiff testified that he last worked as a lead handler for four months in 1989, when he was in his early twenties, but was forced to resign due to his back pain. (Admin Tr. 1204, Doc. 10-7 p. 88). Since that time, Plaintiff has been incarcerated on multiple occasions, and spent an estimated total of ten to eleven years in prison due on various charges. (Admin Tr. 1205, Doc. 10-7 p. 89). Plaintiff told the consultative examiner that he had never held a job for more than four months. (Admin Tr. 836, Doc. 10-5 p. 28).

At step two of her analysis, the ALJ found that Plaintiff had the severe impairments of: degenerative disc disease; radiculopathy; bilateral carpal tunnel syndrome; gastrointestinal reflux/irritable bowel syndrome; sinusitis; chronic obstructive pulmonary disease; major depressive disorder; panic disorder; alcohol dependence; stimulant dependence; antisocial personality disorder; and, avoidant personality disorder. (Admin Tr. 20, Doc. 10 p. 23)

At step three of her analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin Tr. 20, Doc. 10 p. 23).

Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform a range of light work as defined in 20 C.F.R. §416.967(b), except that:

> He could never climb ladders, ropes, or scaffolds. He can occasionally stoop crouch, kneel or crawl. He must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dust, gasses, poor ventilation, chemicals and hazards such as heights and moving machinery. He could understand, remember and carry out simply instructions, in an

> environment free of fast-paced production requirements, involving only simple work-related decision, with few work place changes. He could have occasional interaction with supervisors and coworkers and no interaction with the public.

(Admin Tr. 23, Doc. 10 p. 26). In making this determination the ALJ considered the relevant portions of the voluminous 1,226 page evidentiary record, which included: Plaintiff's hearing testimony (Admin Tr. 1195-1226, Doc. 10-7 pp. 79-110); function report forms filled out by Plaintiff (Admin Tr. 677-84, Doc. 10-4 pp. 26-33), and his by family friend and caretaker Dianne Zimmerman ( Admin Tr. 669-76, Doc. 10-4 pp. 18-25); a pain questionnaire completed by Plaintiff, (Admin Tr. 685-86, Doc. 10-4 pp. 34-35); multiple imaging and other diagnostic studies documenting the progression of Plaintiff's degenerative disc disease dating back to 2008; treatment records from Plaintiff's primary care source, Certified Registered Nurse Practitioner ("CRNP") Karen Kepner, and from several specialists such as neurologist John Chawluk, Dr. Kevin McGargaran; a medical source statement and employability assessment by CRNP Kepner, (Admin Tr. 697-98, Doc. 10-4 p. 46-47; Admin Tr. 1036-39, Doc. 10-6 pp. 67-70); a report and medical source statement completed after a consultative psychiatric examination performed by Dr. David O'Connell (Admin Tr. 834-42, Doc. 10-5 pp. 26-34); a report and RFC assessment by consultative medical examiner, Dr. Jeffrey Chimshosky (Admin Tr. 843-52, Doc. 10-5 pp. 35-44); and a mental RFC assessment completed by state agency psychologist Mark Hite after his review of the evidence of record (Admin Tr. 579-81, Doc. 10-3 pp. 82-85).[2]

---

[2] The Court notes that the record also includes additional medical opinions prepared by several sources in connection with a prior application for benefits, such as: an earlier consultative examination report by Dr. O'Connell (Admin Tr. 179-89, Doc. 10 pp. 182-88, Doc. 10-1 pp. 1-4); a mental RFC assessment and PRT form by state agency reviewing
*(footnote continued on next page)*

7

As the Court writes primarily for the benefit of the parties, and because the evidentiary record in this case is voluminous, it will limit its discussion of the evidence to that which is directly relevant to the arguments raised in the briefs.

On May 16, 2011, CRNP Kepner submitted an employability assessment form to the Pennsylvania Department of Public Welfare on Plaintiff's behalf. In the form, CRNP Kepner reported that, based on Plaintiff's clinical history, her review of Plaintiff's medical records and specialist notes, and her own physical examination, Plaintiff was permanently disabled due to chronic neck and back pain, anxiety, depression, and anti-social behavior. (Admin Tr. 1036-39, Doc. 10-6 pp. 67-70). On July 20, 2011, CRNP Kepner completed a medical source statement of Plaintiff's physical ability to perform basic work activities and reported that Plaintiff could: occasionally lift or carry up to twenty five pounds, and frequently lift or carry up to two pounds; stand and walk up to two hours per day; sit up to four hours per day; occasionally bend and kneel; and, never stoop, crouch, balance, or climb. (Admin Tr. 697-98, Doc. 10-4 p. 46-47). CRNP Kepner recommended that Plaintiff avoid exposure to poor ventilation, heights, moving machinery, vibration, temperature extremes, chemicals, wetness, dust, fumes, odors, gasses, and humidity due to his COPD and sinus issues. *Id.* She also noted that Plaintiff's abilities to reach, handle, finger, feel, see, hear, speak, and taste were not limited by his impairments. *Id.*

---

psychologist Michael Suminski (Admin Tr. 361-77, Doc. 10-2 pp. 27-43); a consultative examination report and medical source statement by Dr. Minaben Patel (Admin Tr. 379-88, Doc. 10-2 pp. 45-54); and, a prior employability assessment form by CRNP Kepner (Admin Tr. 396-98, Doc. 10-2 pp. 62-64).

In August 2011, Dr. Chimahosky, a consulting internist, noted that Plaintiff walked with a normal and smooth gait, had a physiological range of motion in his neck with some cervical motion tenderness. (Admin Tr. 843-52, Doc. 10-5 pp. 35-44). Dr. Chimahosky assessed that Plaintiff had the ability to occasionally lift or carry up to twenty-five pounds and frequently lift or carry up to twenty pounds, and walk, sit or stand without limitation. *Id.*

The medical evidence of record reveals that Plaintiff has a long history of treatment for neck and back pain, which apparently originated as a result of injuries sustained in a motor vehicle accident in 1989 which were exacerbated by several subsequent motor vehicle crashes. A January 2008 radiology report revealed moderate disc space narrowing with minimal degenerative changes and slight subluxations in Plaintiff's cervical spine. (Admin Tr. 767, Doc. 10-4 p. 116). A July 2009 MRI of Plaintiff's cervical spine revealed the impression of degenerative uncovertable osteophyte changes most prominent at C3-C4 and at C5-C6 resulting in bilateral neuroforaminal stenosis, (Admin Tr. 763, Doc. 10-4 p. 112), an EMG from the same month revealed the impression of left C6-C7 radiculopathy and mind right carpal tunnel syndrome. (Admin Tr. 762, Doc. 10-5 p. 111). A November 2008 CT scan of Plaintiff's cervical spine revealed the impression of mild discogenic change at C3-C4 and C5-C6, and moderate foraminal stenosis at C5-C6. (Admin Tr. 760, Doc. 10-5 p. 109). A second MRI of Plaintiff's cervical spine in April 2009 revealed the impression of: bony and discogenic changes at C5-C6 leading to bilateral foraminal stenosis with possible bilateral C6 nerve root compromise; and bony and discogenic changes at C3-C4 leading to moderate to severe right foraminal stenosis with possible right C4 nerve root compression. (Admin Tr. 756-57, Doc. 10-5 pp. 105-06). A third MRI of Plaintiff's cervical spine performed on June 10, 2010, revealed the impression of bilateral moderate to significant neural foraminal stenosis at C3-C4 with compromise of the

exiting C4 nerve root and bilateral moderate neural foraminal stenosis at C5-C6 with probable mild compromise of the exiting C6 nerve root bilaterally. (Admin Tr. 718, Doc. 10-4 p. 67). A December 2010 radiology report revealed the impression of multiple level non uniform degenerative disc space narrowing, predominating at C5-C6. (Admin Tr. 724, Doc. 10-4 pp. 73). A fourth MRI of Plaintiff's cervical spine taken in January 2012, revealed the impression of multilevel degenerative changes causing multilevel foraminal stenosis (most pronounced at C5-C6), a right paracentral disc osteophyte complex protruding into the origin of the right C3-C4 neural foramina causing moderate foraminal stenosis at this level. (Admin Tr. 994-95, Doc. 10-6 pp. 25-26).

      As noted by the ALJ, despite Plaintiff's multiple complaints, physical examinations have not been particularly adverse. Examinations by both treating and examining medical sources revealed that Plaintiff's cervical range of motion was only slightly diminished, his reflexes were only slightly hypoactive, and that he ambulated with a normal gait without the use of any assistive device. Until 2010, Plaintiff's pain was managed through the use of narcotic pain medications, and steroid injections. However, in an office note dated June 3, 2010, when Plaintiff complained that the steroid injections were no longer effective, Plaintiff's neurologist noted that Plaintiff had exhausted conservative management of his condition and that his only other option was to seek a surgical opinion. (Admin Tr. 755, Doc. 10-5 p. 104). The Court notes that Plaintiff was only partially compliant with the recommended course of treatment – i.e., Plaintiff did not follow through with the recommended course of physical therapy, though he did undergo two courses of steroid injections. Finally, on May 31, 2012, two years after a surgical consult was recommended and one month prior to the administrative hearing in this action, Plaintiff underwent spinal fusion surgery.

On the date of the hearing, Plaintiff had not yet had his post-surgical follow-up examination. Plaintiff testified that, prior to his surgery he experienced pain and numbness that radiated from his neck down his left arm and into his left (dominant) hand. He reported that, as a result, his hand was not a sensitive to extreme temperatures, and that he "sometimes" had problems picking things up with that hand. (Admin Tr. 1206-08, Doc. 10-7 pp. 90-92). He also testified that for the first three days following surgery he believed that that symptom had been alleviated, but it began to return on the fourth day. *Id.* He also testified that he could not lift anything heavier than a gallon of milk, and could not twist or turn, and had headaches and difficulty sleeping following surgery. *Id.*

With respect to Plaintiff's mental impairments, Plaintiff testified that he gets very anxious around people, and as a result experiences the urge to wrap his hands around something and squeeze; he explained this urge was directed towards human beings at times, which is why he avoids spending time with other people. (Admin Tr. 1211-12, Doc. 10-5 pp. 95-96). It is also notable that Plaintiff told Dr. O'Connell that he was involuntarily committed in the 1990's following a failed suicide attempt, and that he had attempted "suicide by cop" by provoking a police officer into seriously hurting or killing him. (Admin Tr. 835, Doc. 10-5 p. 27). The record reflects that Plaintiff reported to CRNP Kepner for medication management, and did not seek out any specialized treatment for his anxiety. Plaintiff testified that he refused to seek out any mental health treatment because he "can't stand mental health workers, period." (Admin Tr. 1216, Doc. 10-7 p. 100).

On August 30, 2011, Dr. O'Connell conducted his second consultative examination of Plaintiff at the Social Security Administration's behest,[3] and assessed Plaintiff's ability to perform the mental demands required in the workplace. (Admin Tr. 834-42, Doc. 10-5 pp. 26-34). Dr. O'Connell opined that Plaintiff's impairment did not result in any limitation in his ability to take care of his household, shop, cook or clean, and also found that Plaintiff was able to maintain concentration and pace to the extent that he could listen to the radio, watch television, read the newspaper, and do light cooking and chores. *Id.* Dr. O'Connell did note, however, that Plaintiff's biggest problem was in the area of social functioning, as Plaintiff reported that he became angry and irritated around people; he found that Plaintiff was extremely limited in his ability to respond appropriately to work pressures and changes in a routine work setting. *Id.*

On September 13, 2011, after reviewing the available records, state agency psychologist Mark Hite opined that the limitations resulting from Plaintiff's impairments do not preclude him from performing the basic mental demands of simple, routine, repetitive work on a sustained basis. (Admin Tr. 581, Doc. 10-3 p. 84). Dr. Hite also opined that Plaintiff's ability to interact with the public and accept instruction from supervisors was only moderately, as opposed to extremely, limited because Plaintiff had no history of problems getting along with others or with authority, and because he presented to the CE in a cooperative manner. *Id.*

---

[3] As noted previously, Dr. O'Connell examined Plaintiff in connection with a prior application for benefits.

The Social Security Regulations considers a claimant's past work experience when it was done within the last fifteen years. 20 C.F.R. §416.965(a). As discussed above, Plaintiff testified that he has not worked since 1989. As such, the ALJ found at step four that Plaintiff had no past relevant work. (Admin Tr. 28, Doc. 10 p. 31).

At step five of her analysis, the ALJ found that considering Plaintiff's age, education, work experience, and the above-mentioned RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Admin Tr. 29, Doc. 10 p. 32). The ALJ based her findings on testimony by a VE that an individual with the same RFC and vocational factors as Plaintiff could perform the representative occupations of inspector, packager, and small products inspector. (Admin Tr. 1223-24, Doc. 10-7 pp. 107-08).

  C. THE ALJ'S DECISION THAT PLAINTIFF'S BACK IMPAIRMENT DID NOT MEET OR MEDICALLY EQUAL A LISTING IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

The listing of impairments published by the Social Security Administration is used to streamline the decision-making process in adjudicating claims for benefits by acknowledging those impairments that are so severe as to preclude substantial gainful activity independent of any other factor. If a claimant's impairment meets or equals one of the listed impairments, the claimant is considered disabled per se, and is awarded benefits. 20 C.F.R. §416.920(d). However, to qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, Plaintiff bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); 20 C.F.R. §416.920(d). An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. *Id.*

To meet listing 1.04A, Plaintiff must produce evidence of (1) a spine disorder "resulting in compromise of a nerve root … or the spinal cord,: and (2) "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, Appendix 1 §1.04A. In concluding that Plaintiff did not meet listing 1.04A, the ALJ explained that:

> The record does not indicate that the claimant has nerve root compression of the spine, nor do the clinical findings indicate that the claimant has consistently had a neuro-anatomic distribution of pain, limitation of range of motion of the spine, neuro-anatomic sensory or reflex loss, or a positive straight leg raising test for a period of twelve continuous months following the alleged onset date of disability at listing level.

(Admin Tr. 20, Doc. 10 p. 23).

Plaintiff contends that the ALJ erred in finding that Plaintiff did not meet listing 1.04A. In support of his argument that he meets listing 1.04, Plaintiff points to an April 2009 MRI (revealing the impression of possible right C4 nerve root compression), a July 2008 EMG (demonstrating left C6-C7 radiculopathy), and a December 2010 radiology report (revealing non uniform degenerative disc space narrowing at C5-C6). However, as noted by the Commissioner neither the above cited evidence, nor the record as a whole, contains any consistent clinical findings during the relevant period that Plaintiff experienced motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss as required by listing 1.04A. For example, in August 2011, treating neurologist Fred G. McMurry, M.D., noted that, although Plaintiff's deep tendon reflexes in his biceps and sensation in his left thumb were diminished, he had full muscle strength in his upper extremities. (Admin Tr. 1014-1015,

Doc. 10-6 pp. 45-46). A few weeks later, Dr. Chimahosky noted that Plaintiff had normal muscle strength and tone in his neck, spine, upper extremities, hands, and lower extremities. (Admin Tr. 844, Doc. 10-5 p. 36). Similarly, in March 2012, neurosurgeon Jonathan R. Slotkin, M.D., noted that although Plaintiff had decreased sensation in the left lateral upper arm, left forearm, and left thumb, he had 5/5 strength in his right and left upper extremities, except that Plaintiff's strength was 4+/5 in Plaintiff's left triceps. (Admin Tr. 1110, Doc. 10-6 p. 141). Further, CRNP Kepner's examination notes from the relevant period reflect that Plaintiff exhibited no atrophy, good muscle tone, and good strength in all extremities. (Admin Tr. 699-702, Doc. 10-4 pp. 48-51). Accordingly, the Court finds that the ALJ's decision that Plaintiff did not meet listing 1.04A is supported by substantial evidence.

> D. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DECISION TO DISCOUNT CRNP KEPNER'S MEDICAL SOURCE STATEMENT

Plaintiff contends that the ALJ improperly rejected a medical source statement by CRNP Kepner, who he characterized as his "primary care medical professional." As noted by the Commissioner in her brief, under the Regulations, a "treating source" is a claimant's "physician, psychologist, or other *acceptable medical source* who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.902.

In her decision, the ALJ accorded "no weight" to CRNP Kepner's medical source statement because a nurse practitioner is not an "acceptable medical source" as it is defined by the Social Security Regulations, and because the statement was not well-supported by the evidence of record. (Admin Tr. 27, Doc. 10 p. 30); *see also* 20 C.F.R. §416.913(a)(providing that "acceptable medical sources" are licensed physicians, licensed or certified psychologists,

licensed optometrists, qualified speech-language pathologists); SSR 06-03p, 2006 WL 2329939 at *2 (recognizing that a nurse practitioner is not an 'acceptable medical source' under the Social Security Regulations). Plaintiff contends that CRNP Kepner's medical source statement should have been given greater consideration by the ALJ. SSR 06-03p, provides that "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that *may* justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' … However, depending on the particular facts in a case, and *after applying the factors for weighing opinion evidence*, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source'…" 2006 WL 2329939 at *5 (*emphasis added*). In applying the regulatory factors for weighing opinion evidence identified in 20 C.F.R. §416.927 and summarized in SSR 06-03p to CRNP Kepner's opinion, the ALJ found that it was not "well supported" by the evidence of record which the ALJ summarized at length in her opinion. *See* 20 C.F.R. §416.927(c)(3)("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Here, CRNP Kepner did submit her examination notes, but the notes do not include any clinical observations suggesting that Plaintiff was as limited as the medical source statement reflects. CRNP Kepner's clinical observations during the relevant period reflect that, despite his complaints of chronic neck pain, Plaintiff had a full range of motion in all extremities, walked with a normal gait, and had no atrophy, good muscle tone, and good strength in all four extremities. (Admin Tr. 699-702, Doc. 10-4 pp. 48-51).

With respect to Plaintiff's brusque assertion that the ALJ improperly discounted the extreme limitations noted by Dr. O'Connell, the Court similarly finds that the ALJ's decision is supported by substantial evidence. In her decision, the ALJ accorded "great weight" to Dr. O'Connell's diagnoses, but little weight to his GAF score and some of the limitations in the medical source statement – i.e., the extreme limitations he identified. The ALJ explained that

> [Dr. O'Connell's] opinion is not consistent with his own findings on mental status evaluation. The claimant was oriented, his presentation was appropriate and displayed no evidence of psychosis and no problems with impulse control. A longitudinal review of the entire record shows that the claimant can function at a much higher level than the consultative examiner has opinion. The consultant's opinion is at best, a snapshot of the claimant's true level of overall functioning. His opinion appears to be greatly based on subjective complaints.

(Admin Tr. 26-27, Doc. 10 pp. 29-30).

As noted by the Commissioner, the ALJ was not alone in noting that Dr. O'Connell's medical source statement was seemingly inconsistent with his narrative report; state agency reviewing psychologist, Dr. Hite, also noted this inconsistency. Dr. Hite specifically noted that the extreme limitations noted by Dr. O'Connell were at odds with his observations that Plaintiff had no documented history of problems getting along with others or with authority, and because he presented to the CE in a cooperative manner. In discounting Plaintiff's credibility the ALJ similarly noted that Plaintiff was cooperative at the hearing, was coherent and displayed no lapses in attention, and reported that he was able to watch television, listen to the radio and play video games, which belied Plaintiff's assertions that he suffered from deficits in the area of concentration. (Admin Tr. 28, Doc. 10 p. 31). The ALJ also noted that Plaintiff's treatment for his mental health issues has been limited to medication management by CRNP Kepner, and that he has not required any inpatient hospitalizations or frequent emergency room treatment for his mental health issues during the relevant period. *Id.* Furthermore, an ALJ may

properly discredit portions of a physician's opinion where it was, as here, premised largely on a Plaintiff's own accounts of his or her symptoms, so long as Plaintiff's complaints were also properly discounted, as they were in this case due to the complete lack of any ongoing mental health treatment.  *See e.g. Morris v. Barnhart*, 78 Fed. Appx. 820, 825 (3d Cir. 2003).

### III.  CONCLUSION

Our review of the administrative record reveals that the final decision of the Commissioner denying Plaintiff's application for benefits is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. §405(g), the Commissioner's decision is affirmed.

An appropriate Order will follow.


**Dated: November 13, 2014**                                             *s/ Karoline Mehalchick*
                                                                                                 **KAROLINE MEHALCHICK**
                                                                                                 **United States Magistrate Judge**